**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LYDIA MONHEIM, Administratrix of the | ) | |
| ESTATE OF ANDREW MONHEIM, | ) | |
| Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-913 |
| | ) | |
| | ) | |
| UNION RAILROAD COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CONTI, Chief District Judge**

A wrongful death action was brought in this case pursuant to the Federal

Employers' Liability Act, 45 U.S.C. § 51-60 ("FELA"), because the decedent, Andrew Monheim

("Monheim") died as a result of injuries sustained from a collision that occurred while he

operated a locomotive on behalf of Union Railroad Company (the "Railroad").  Lydia Monheim,

administratrix of the estate of her deceased husband (referred to herein as the "Estate"), seeks to

recover monetary damages.

The Railroad filed a motion for summary judgment, (ECF No. 152), in which it

contends that the Estate failed to produce sufficient evidence in support of its negligence claim,

and challenges the legal viability of several of the Estate's damages claims.  The Railroad filed a

brief in support of the motion, (ECF No. 153), a concise statement of material facts, (ECF No.

154), and a reply brief, (ECF No. 158).   The Railroad filed a response to the Estate's motion and

concise statement of facts, (ECF Nos. 161 and 163), and an opposition brief (ECF No. 162).

Although the parties submitted a joint concise statement of material facts, (ECF No. 164), it is not in the format requested by the court, and, therefore, at times, pertinent factual references must be made to the Railroad's statement of material facts and the Estate's response thereto (ECF Nos. 154 and 163, respectively).

For the reasons that follow, the Railroad's motion is granted with respect to the Estate's claim that configuring the locomotive operated by Monheim short-nose forward violated the FELA. The motion is denied, however, with respect to the Estate's claim that the Railroad violated the FELA by assigning Monheim to the operational locomotive alone on the night of the collision. A jury must determine whether the Railroad acted negligently under the FELA in doing so. A jury must also determine whether, and what amount of, damages should be awarded to the Estate based upon Monheim's conscious pain and suffering, and Monheim's son's loss of his father's care, counseling, and training. The court finds, however, that the latter category of damages will expire on the date that Monheim's son reaches the age of majority, due to a lack of evidence of special circumstances.

I. **FACTUAL BACKGROUND**

All material facts set forth herein are undisputed unless otherwise indicated. All disputed material facts are construed in favor of the Estate, the nonmoving party. Additional material facts may be discussed elsewhere in this memorandum opinion, in context.

This case involves a side-swipe train collision that occurred at approximately 3:29 a.m. on March 16, 2010, when a train being operated by Monheim failed to stop at a red signal. (ECF No. 164 ¶¶ 1, 16.) At the time of the accident, Monheim, who was employed as a freight locomotive engineer by the Railroad, was operating a northbound freight train that was traveling

from the Irvin Works rail yard to the Edgar Thompson rail yard, which is a distance of several miles, on mainline track through signal territory. (Id. ¶¶ 2, 7-9, 69.)

The train operated by Monheim had the work designation "50C" and consisted of three locomotives, forty-one empty slab cars, and a caboose. (Id. ¶¶ 3-4, 14.) Monheim was in the operational locomotive, in a short-nose forward configuration, and the other three crew members were in the caboose. (Id. ¶¶ 5-6, 25; ECF Nos. 154 and 163 ¶ 80 (Estate's equivocation irrelevant).) When the 50C train left the Irvin Works yard, and at the time of the collision, the locomotive being operated by Monheim was the lead car, but the crew planned to switch to a "shove move," meaning that the caboose would become the lead car and the locomotives would push the train into the yard upon arriving at the Edgar Thompson yard. (ECF No. 164 ¶¶ 67, 74.)

The other train involved in the accident, which had the work designation "76C", consisted of four locomotives, ninety cars filled with iron-ore, and a caboose. (Id. ¶¶ 10-12, 14.) Two employees were in the lead locomotive of the 76C train and two employees were in its caboose. (Id. ¶ 12.)

Monheim verbally communicated, via radio, with the Train Movement Director approximately nine minutes before the collision occurred and manipulated the throttle from position 4 to position 3 approximately seven minutes before the collision occurred. (Id. ¶¶ 17, 19; ECF Nos. 154 and 163 ¶ 78 (Estate's equivocation irrelevant).) Monheim's last known act was this throttle manipulation, and there is no evidence about what happened in the locomotive between that time and the time of the collision. (ECF No. 164 ¶ 21; ECF Nos. 154 and 163 ¶ 114 (Estate's equivocation irrelevant).) The locomotive operated by Monheim went past the red stop signal at Signal 112 at approximately 3:29:14 a.m. and came into contact with the 76C train less than twenty seconds later. (ECF No. 164 ¶ 22.) The train operated by Monheim traveled 163 feet

past Signal 112, at approximately six miles per hour, before colliding with moving rail cars on the 76C train. (Id. ¶¶ 23-24, 81.) Monheim's body was located hours after the collision, buried in less than a foot of iron-ore pellets that had spilled out of one of the 76C train's cars after the crash. (Id. ¶ 172.)

The remaining legal claims at issue in this case are that the Railroad violated the FELA by: (1) not assigning an additional crewmember to be in the operational locomotive with Monheim; and (2) configuring the locomotive operated by Monheim long-nose forward instead of short-nose forward. (ECF No. 152-8.)

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate if the record shows that there is no genuine dispute with respect to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact – that is, a fact that would affect the outcome of the suit under the governing substantive law – will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Even then, the dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor. Id. at 248-49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. Liberty Lobby, 477 U.S. at 255; Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw

Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The summary judgment inquiry asks whether there is a need for trial – "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000) (citing cases); Liberty Lobby, 477 U.S. at 248-49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. Celotex, 477 U.S. at 323; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating that there is an absence of evidence to support the nonmoving party's case. Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (citing Celotex, 477 U.S. at 325). A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. Celotex, 477 U.S. at 322-23. Once the movant meets that burden, the burden shifts to the nonmoving party to "set forth specific

facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. FED. R. CIV. P. 56(e); see Liberty Lobby, 477 U.S. at 247–48; Celotex, 477 U.S. at 323-25. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. Liberty Lobby, 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F.App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

### B. The FELA

Under the FELA "[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier ... ." 45 U.S.C. § 51. The FELA is not a strict liability or workers' compensation statute; it is a negligence statute with an explicitly-stated relaxed standard of causation. Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 542–543 (1994). In order to present a prima facie case under the FELA, an employee must establish that: (1) he was injured within the scope of his employment; (2) his employment was in furtherance of the railroad's

interstate transportation business; (3) the railroad was negligent; and (4) that negligence played some part in causing the injury for which he seeks compensation. See Van Gorder v. Grand Trunk W. R.R., 509 F.3d 265, 269 (6th Cir. 2007).  At the summary judgment stage, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." CSX Transp., Inc. v. McBride, 131 S.Ct. 2630, 2636 (2011) (quoting Rogers v. Missouri Pacific R.R. Co., 352 U.S. 500, 506 (1957)).

Although the standard for causation is lessened under the FELA, a plaintiff must nevertheless demonstrate the common law elements of negligence: i.e., duty, breach, foreseeability, and causation.  Illinois Cent. R.R. Co. v. Skaggs, 240 U.S. 66 (1916); Gottshall v. Consol. Rail Corp., 988 F.2d 355, 374 (3d Cir. 1993), rev'd on other grounds, 512 U.S. 532 (1994); Happ v. Norfolk S. R.R. Co., No. 05-419, 2006 WL 2645147, at *1 (W.D. Pa. Sept. 14, 2006).

The employer's duty of care under the FELA is to provide its employees with a reasonably safe work environment under the circumstances. Atchison Ry. Co. v. Buell, 480 U.S. 557, 558 (1987); Bailey v. Cent. Vermont R.R., 319 U.S. 350, 352 (1943); Tiller v. Atlantic C.L.R. Co., 318 U.S. 54, 67 (1943); Padgett v. S. Ry., 396 F.2d 303, 306 (6th Cir. 1968); Manson v. Se. Pa. Transp. Auth., 767 A.2d 1, 4 (Pa. Commw. Ct. 2001) (citing Peyton v. St. Louis Sw. Ry. Co., 962 F.2d 832 (8th Cir. 1992)).  A railroad breaches this duty when it fails to use ordinary care under the circumstances or fails to do what a reasonably prudent person would have done under the circumstances to make the working environment safe. Tiller, 318 U.S. at 67. In other words, a railroad breaches its duty when it knew, or by the exercise of due care, should have known that its operations were inadequate to protect its employees. Urie v. Thompson, 337

U.S. 163, 182 (1949). A FELA plaintiff "must show that the employer, with the exercise of due

care, 'could have reasonably foreseen that a particular condition could cause injury'" and had, or

should have had, some knowledge of the unsafe condition. Manson, 767 A.2d at 4 (quoting

Porreva v. Nat'l R.R. Passenger Corp., No. 98-4137, 1999 WL 199806, at *1 (E.D. Pa. Apr. 7,

1999)).

   A FELA plaintiff need only present a minimum amount of evidence in order to

defeat a summary judgment motion. Hines v. Consol. Rail Corp., 926 F.2d 262, 268 (3d Cir.

1991) (citing Pehowic v. Erie Lackawanna R.R., 430 F.2d 697 (3d Cir. 1970)). "A trial court is

justified in withdrawing ... issue[s] from the jury's consideration only in those extremely rare

instances where there is a zero probability either of employer negligence or that any such

negligence contributed to the injury of an employee." Pehowic, 430 F.2d at 699-700; see Eckert

v. Aliquippa & S. R.R., 828 F.2d 183, 187 (3d Cir. 1987) (applying Pehowic's zero probability

test); Masters v. Norfolk S. Ry. Co., Inc., No. 08-1872, 2010 WL 4973315, at *8 (Oct. 6, 2010)

(same); Happ, 2006 WL 2645147, at *1 (same).

   The ultimate question is whether a reasonable jury could reach the conclusion that

the employer was negligent in whole or in part; the FELA plaintiff must present probative facts

from which the negligence and causal relationship can reasonably be inferred in order to survive

summary judgment. Rogers, 352 U.S. at 508; Dessi v. Pa. R.R. Co., 251 F.2d 149, 151 (3d Cir.

1958). Even though the standards of proof are lessened under the court of appeals' zero

probability test and the FELA's lessened statutory test for causation, a plaintiff's case cannot

survive summary judgment based pure speculation or a record completely devoid of probative

facts. Newton v. Norfolk S. Corp., No. 05-1465, 2009 WL 55998, *8 (W.D. Pa. Jan. 3, 2008).

## III.   DISCUSSION

### A.  One-Man Crew in Locomotive Claim

The Estate contends that the Railroad was negligent, and in violation of the FELA, by assigning Monheim to operate a locomotive alone during a several mile trip at slow speed on main-line track in signal territory at 3:00 in the morning with the windows and doors of the compartment closed and the heaters on. (ECF No. 162 at 1-2.)   The Railroad asks this court to enter judgment as a matter of law in its favor on this claim on the ground that the Estate failed to produce sufficient evidence to establish that the Railroad breached its duty of care under the FELA, or, even assuming that it did, that the accident was foreseeable or caused, to any degree, by the Railroad's negligence. (ECF No. 153 at 15, 19, 23, 25.)  Because the Estate adduced sufficient evidence with respect to each element of this negligence claim, the court is unable to find that there is zero probability that a reasonable jury could conclude that the Railroad was negligent under the circumstances.  This claim, therefore, must be submitted to a jury.

In support of its argument that a one-man crew cannot form the basis of liability under the FELA, the Railroad points out that neither the Federal Railroad Administration ("FRA") nor the National Transportation Safety Board ("NTSB") adopted operating rules requiring that two crewmembers be present in a locomotive at all times, and that its operations conformed to industry standards and to a decision rendered by the Commonwealth Court of Pennsylvania.[1] (ECF No. 153 at 2, 15-17.)   The Railroad argues that even if it breached a duty of care to Monheim, there is no evidence from which a reasonable jury could find it liable

---

[1] The court can summarily dispense with the Railroad's argument concerning the commonwealth court's decision.  That decision, <u>Consolidated Rail Corporation v. Pennsylvania Public Utility Commission</u>, 625 A.2d 741, 742 n.1 (Pa. Commw. Ct. 1993), explicitly applied to "light engines," i.e., locomotives without any railroad cars attached.  Monheim was not operating a light engine on the night of the accident.

because a) the record reflects that no one anticipated that an accident would occur on March 16, 2010, and the accident was solely Monheim's fault, and b) the record is devoid of any evidence that a second person in the locomotive would have prevented the accident.  (Id. at 23-27.)

In response, the Estate argues that two of its expert witnesses, Paul F. Byrnes ("Byrnes") and Stephen B. Wilcox ("Wilcox"), as well as five of Monheim's former co-workers, Raymond Zelinski, Vernon Nelson, Jared Nolfi, Yvonne Betts, and Steven Barnyk, testified that a second crewmember would be expected to ride in the locomotive, and that a two-person crew is safer than a one-person crew. (ECF No. 162 at 3-9.)  In addition, both Byrnes and Wilcox opine that the Railroad knew or should have known, given the unique circumstances of the operation in question, that a worker would likely become drowsy or inattentive, making it unreasonably unsafe to assign only one crewmember to the operational locomotive. (Id. at 3-4.) Byrnes and Wilcox opine specifically that a second person would have been able to prevent the collision, and several employees testified that they were trained to pull the emergency break if the engineer could not operate the locomotive for any reason. (Id. at 8-10.)

As an initial matter, the Railroad's contention that there can be no liability under the FELA because it followed industry regulations and practices lacks merit.  This is not determinative with respect to whether a work environment is reasonably safe under the FELA. Put another way, just because the Railroad was essentially doing what every other railroad was doing does not mean that the Railroad was providing a reasonably safe workplace. See Allenbaugh v. BNSF Ry. Co., 832 F.Supp.2d 1260, 1265 (E.D. Wash. 2011).  With respect to the Railroad's assertion that it was in compliance with FRA and NTSB regulations, which do not require two crewmembers to be in an operational locomotive, the Railroad made no showing that any particular regulation "substantially subsume[s] the subject matter" of the Estate's FELA

claim, or that the agencies failed to promulgate regulations specifically in order to sanction single member crews. CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993). The Railroad made no showing that the Estate's one-man crew claim under the FELA is preempted by or subsumed within any federal regulation.

By the same token, however, the Estate's contention that the Railroad violated its own internal operating rules that night is not determinative of the instant motion, for several reasons. (ECF No. 162 at 7-8.) First, although the Estate cites to the Railroad's Rules 8.9 and 8.10.1 in its briefing, it does not identify where in the record to locate copies of these provisions. These rules are not identified in the Estate's index of exhibits in support of its opposition to the Railroad's motion, and no citation is made to them in the Estate's briefing. (ECF No. 161 at 2-3.) Second, much of the deposition testimony cited by the Estate in support of its argument concerning these rules does not support the contentions for which they are cited. For instance, although the Estate cites to the deposition of Steven Barnyk ("Barnyk") for the proposition that he was trained to follow Rule 8.9, at the page cited, Barnyk denies knowledge of that rule. (ECF No. 162 at 7.) Likewise, Raymond Zelinski addresses the rules not on pages 16 to 20 of his deposition, as the Estate contends, but at pages 24:12 and 30:8. (Id.) Third, there appears to be a genuine dispute about whether these rules apply only to "shove moves," and whether any evidence about rule violations is admissible in this case based upon the court's prior rulings. The parties failed to provide the court with sufficient information in their briefing to make an ultimate determination on these questions. Because the court can decide the instant motion in favor of the Estate without resolving these disputes, or considering the content of the internal operating rules, these issues can be deferred.

There is ample evidence, both expert and lay, that by assigning Monheim to the locomotive alone that night, the Railroad failed to use ordinary care under the circumstances or to do what a reasonably prudent railroad would have done under the circumstances to make the working environment reasonably safe. Tiller, 318 U.S. at 67.  As referenced above, the Estate presents testimony from five lay witnesses and two expert witnesses that a second crewmember is expected to be in an operational locomotive and that the locomotive would be safer with two crewmembers in it. (ECF No. 162 at 3-9.)  The court confirmed that the deposition testimony cited in this regard does indeed support the Estate's factual assertions.  In addition, the Estate's expert witnesses opined that the Railroad knew, or should have known, that a worker could become drowsy or inattentive under the circumstances of that night. (Id. at 3-4.)  This is ample evidence from which a reasonable jury could find that the Railroad breached its duty under the FELA to provide its employees with a reasonably safe work environment under the circumstances.

The Estate also produced sufficient circumstantial evidence that the Railroad could have reasonably foreseen that assigning Monheim to the operational locomotive alone that night could cause injury. Manson, 767 A.2d at 4.  Contrary to the Railroad's contention, the question is not whether any of the employees on the 50C or 76C train that night actually anticipated or predicted that a collision would occur.  The question is whether the Railroad could have foreseen that failing to assign a second crewmember to the operational locomotive, under the existing circumstances that night, could result in injury to an employee.  The Estate adduced sufficient evidence, under the Court of Appeals for the Third Circuit's lenient zero probability test, that an accident was reasonably foreseeable because an employee could become distracted,

inattentive, or incapacitated. (ECF No. 162 at 3-4 (expert testimony), 9 (former co-worker testimony).)

The Estate likewise offered sufficient evidence on the causation element of its FELA negligence claim. When the FELA's explicitly-stated lower standard of causation is combined with the Court of Appeals for the Third Circuit's zero probability summary judgment test, the Estate's evidentiary burden on the causation element is unquestionably minimal. The Estate's expert testimony in support of its theory of causation, as well as its citation to testimony from Monheim's former co-workers to the effect that a second crewmember is trained to pull the emergency brake, if necessary, is sufficient to overcome summary judgment. (ECF No. 162 at 8-9.) A reasonable jury can infer based upon the record presented that a second crewmember in the operational locomotive could have avoided the accident by reviving Monheim, operating the controls for him, contacting the Train Movement Director, or other crewmembers, engaging the emergency break, or taking any combination of these actions.

For each of these reasons, the Estate's FELA claim based upon the Railroad's failure to assign a second crewmember to the locomotive operated by Monheim on the night of March 16, 2010 survives summary judgment and must be presented to a jury for determination.

## B. Short-Nose Forward Configuration Claim

The Estate contends that the Railroad was negligent, and in violation of the FELA, by assigning Monheim to operate a locomotive that was configured short-nose forward on the night of the fatal collision. (ECF No. 162 at 2.) The Railroad asks this court to enter judgment as a matter of law in its favor on this claim because it is a design claim in disguise, which is not cognizable under the FELA, and because the Estate failed to produce sufficient evidence to establish that the Railroad breached its duty of care under the FELA, or, even

assuming that it did, that the accident was caused, to any degree, by the Railroad's negligence. (ECF No. 153 at 21-23, 27-29.)  With respect to this claim, the court finds that there is zero probability that a reasonable jury could conclude that the Railroad was negligent under the circumstances.  The Estate failed to adduce any probative facts to permit a reasonable jury to find in its favor on this claim.  Judgment on this claim will therefore be entered in favor of the Railroad.

The Railroad makes many of the same arguments in support of its contention that configuring the locomotive operated by Monheim short-nose forward cannot form the basis of liability under the FELA as it did in connection with the Estate's one-man crew claim. Specifically, the Railroad again points out that neither the FRA nor the NTSB adopted operating rules requiring that operational locomotives be configured long-nose forward and that industry standards do not dictate such a configuration. (ECF No. 153 at 21-22.)  Similarly, the Railroad again argues that even if it breached a duty of care to Monheim, there is no evidence from which a reasonable jury could find it liable because a) the record reflects that no one anticipated that an accident would occur on March 16, 2010, and the accident was solely Monheim's fault, and b) the record is devoid of any proof that configuring the locomotive long-nose forward would have prevented the accident. (Id. at 23-25, 27-29.)  With respect to this claim, the Railroad specifically argues that the Estate is attempting to assert a design defect claim, which the court previously held is preempted by the Federal Locomotive Inspection Act, 49 U.S.C. §§ 20701, (ECF No. 53 at 6), and that the record reflects that a short-nose forward configuration is safer because it increases visibility (ECF No. 153 at 21-22.)

In response, the Estate argues that Monheim's locomotive was designed to be operated long-nose forward, which configuration increases collision protection. (ECF No. 162 at

11, 32-33.) The Estate contends that if the locomotive were configured long-nose forward, Monheim's cab would have been fifty feet away from and on the opposite side of the point of impact, which would have improved Monheim's chance of surviving the collision. (Id.) The Estate asserts, based upon this evidence, that a "jury could reasonably conclude that [the Railroad's] failure to promulgate rules requiring the long-nose facing forward operation of the locomotive under the circumstances of this movement was negligence." (Id. at 33.)

The only evidence that the Estate produces with respect to its short-nose forward claim is the report and testimony of one of its expert witnesses, Byrnes. As an initial matter, the court limited the scope of Byrnes' testimony during the Daubert proceedings in this case to specifically exclude some of the paragraphs of the expert's report that the Estate relies on in its briefing. (ECF Nos. 156 at 10, 29; 152-36 at 55:22-57:1.) Those paragraphs will not be considered by the court in ruling on the Railroad's motion for summary judgment. Once they are excised, the totality of the Estate's evidence at trial on this claim will be the testimony of one expert witness that: (1) the controls in Monheim's locomotive are designed and installed for long-nose forward operation; (2) locomotives have better collision protection when operated long-nose forward; and (3) Monheim's locomotive could have been easily arranged long-nose forward. (ECF No. 155-19 at ¶¶ 27-30.)

There is no evidence in the record that it is unsafe, as a general matter, to operate a locomotive short-nose forward. In fact, the evidence is to the contrary. Monheim's former co-workers testified consistently that operating a locomotive short-nose forward provides increased visibility, and none identified any inherent danger in operating a locomotive short-nose forward. (ECF No. 153 at 22 (citing testimony).) The Estate offers no evidence that operating a locomotive short-nose forward is an inherently dangerous activity. Given this testimony, and

lack of other evidence, the Railroad's expert's assertion that the locomotive should not have been operated short-nose forward because it was designed for long-nose forward operation is tantamount to a design defect claim, which this court previously found to be barred in this case. Based upon this record, no reasonable jury could conclude that the Railroad failed to use ordinary care under the circumstances to make Monheim's working environment reasonably safe by configuring his locomotive short-nose forward.

The Estate, however, does not argue that the configuration of the locomotive caused the accident. Instead, it alleges that if the locomotive were configured long-nose forward, Monheim might have survived his injuries, or not sustained any injuries at all. Again, much of the evidence on which the Estate relies to support this position was excluded by the court during the Daubert proceedings. The remaining evidence consists of Byrnes' opinion that a long-nose forward configuration provides superior crashworthiness. (ECF No. 155-19 ¶¶ 28-29.) There is no other evidence in the record to support the Estate's position in this regard. The expert's testimony, however, presupposes the exact circumstances in which the locomotive being operated by Monheim crashed. No reasonable jury could conclude, based upon the expert's statement alone, that in every possible collision a long-nose forward configuration increases an employee's chance of surviving a collision. For instance, if the locomotive were hit from behind, or if a train were hit from the side at a point of contact behind the lead locomotive, a short-nose forward configuration could increase an employee's chance of survival.

This distinction is not academic; rather, it is critical to assessing whether a reasonable jury could conclude that the Railroad breached its duty to provide a reasonably safe work environment to Monheim. In that regard, the dispositive question is whether the Railroad failed to use reasonable care under the circumstances by configuring Monheim's locomotive

short-nose forward, or knew, or should have known, that it was unsafe to configure Monheim's locomotive short-nose forward. The record is devoid of any evidence that would support a reasonable jury finding to that effect. For this reason alone, the Estate's FELA claim based upon the short-nose forward configuration of the locomotive fails.

The Estate also failed to produce evidence that would support a reasonable jury finding on the issue of foreseeability. Here, the question is whether the Railroad could have foreseen that configuring a locomotive short-nose forward rather than long-nose forward could result in an increased likelihood of injury. The Estate's foreseeability argument requires that the jury impute to the Railroad, with the benefit of hindsight, knowledge about the exact circumstances in which a collision would occur on the night of March 16, 2010. Only if the Estate shows that the Railroad knew that configuring a locomotive short-nose forward rather than long-nose forward would result in increased injury to Monheim could it establish foreseeability. It is impossible to impute that knowledge to the Railroad. Because there is no evidence in the record that would support a reasonable jury finding that configuring the locomotive short-nose forward rather than long-nose forward would, under any and all circumstances, result in an increased likelihood of injury to an employee, the Estate cannot establish the essential element of foreseeability.

The Estate's claim fails even under the FELA's lowered standards of proof. The Estate's claim amounts to no more than speculation devoid of probative facts, making entry of judgment as a matter of law in favor of the Railroad on this claim appropriate.

**C.  Conscious Pain and Suffering Damages**

Following this court's <u>Daubert</u> rulings, the undisputed evidence is that Monheim experienced two minutes of conscious pain and suffering, and up to an additional two minutes of

semi-conscious pain and suffering. (ECF Nos. 154 and 163 ¶¶ 31-32.)  The Railroad seeks entry

of judgment as a matter of law with respect to the Estate's claim for pain and suffering damages

because: (1) the law does not provide for pain and suffering damages unless a decedent is fully

conscious; and (2) two minutes, or even a total of four minutes, of pain and suffering is a legally

insufficient period of time to justify a damages award under St. Louis, Iron Mountain &

Southern Railway Company v. Craft, 237 U.S. 648 (1915), and Great Northern Railway

Company v. Capital Trust Company, 242 U.S. 144 (1916). (ECF No. 153 at 29-35.)   In

response, the Estate notes that this court previously ruled that its expert forensic pathologist, Dr.

Wayne Ross, can testify about the circumstances surrounding Monheim's conscious pain and

suffering, and argues that Craft and Capital Trust do not apply to this case and are outdated.

(ECF No. 162 at 12-14, 36-38.)

   Under the FELA, the administrator of the estate of a fatally injured employee can

recover for pain and suffering endured by the decedent between the injury and death, which is

referred to as "conscious pain and suffering."  Craft, 237 U.S. at 655, 658.  The test is clear:

recovery is available for "conscious pain and suffering [endured] as a result of [the] injuries" but

not for pain and suffering that is "substantially contemporaneous with," or merely incidental to,

death or is experienced in "the short periods of insensibility which sometimes intervene between

fatal injuries and death."  Id. at 654-55.  The court finds that the Estate presented sufficient

evidence to warrant submitting the question of conscious pain and suffering damages to a jury

for determination.

   As an initial matter, the court rejects the Railroad's contention that Craft and

Capital Trust establish a bright-line rule under which Monheim's two minutes of conscious pain

and suffering, or four minutes of conscious and semi-conscious pain and suffering, are too short

to justify any damages. Those decisions do not themselves establish such a rule, and have not been interpreted to set some minimum threshold period of consciousness before pain and suffering damages can be recovered.

In <u>Capital Trust</u>, the evidence revealed that decedent, although immediately rendered unconscious after being run over by a train, breathed for, at most, an additional ten minutes. <u>Capital Trust</u>, 242 U.S. at 41-42. The Supreme Court held that the estate could not recover for the decedent's pain and suffering. <u>Id.</u> In <u>Capital Trust</u> the evidence was uncontroverted that the decedent never regained consciousness following the accident. Because, in this case, the jury could reasonably find that Monheim was fully conscious for at least two minutes, <u>Capital Trust</u> is distinguishable. The Court did not hold that ten minutes was an insufficient period of consciousness to justify pain and suffering damages, as the Railroad suggests. The Court held that a decedent who remained unconscious after an accident could not recover damages for conscious pain and suffering, although he did not die, from a medical standpoint, until ten minutes after the accident.

In <u>Craft</u>, the Supreme Court recognized that there was conflicting evidence concerning the decedent's condition after being run over by a train car, but accepted that the jury reasonably found that he was conscious for approximately thirty minutes following the accident. <u>Craft</u>, 237 U.S. at 654-55. Accepting that fact, the Court held that the jury could also have reasonably concluded that "while he lived he endured conscious pain and suffering as a result of his injuries." <u>Id.</u> The jury's award of pain and suffering damages, therefore, was upheld. The Railroad, however, seizes upon the Court's comment that "the case is close to the border line, for such pain and suffering as are substantially contemporaneous with death or mere incidents to it, as also the short periods of insensibility which sometimes intervene between fatal injuries and

death." Id. at 655.  This remark is dicta, and does not amount to a holding that time periods of consciousness appreciably less than thirty minutes cannot support an award of pain and suffering damages, as the Railroad contends.

Although the Railroad contends that Craft alone forecloses the Estate's claim for conscious pain and suffering damages because it is undisputed that Monheim remained conscious for, at most, only four minutes, the Railroad cites to no decisions in which Craft was relied upon to foreclose conclusively conscious pain and suffering damages because the decedent failed to remain fully conscious for at least thirty minutes.  The court's independent research revealed that this is not the law under the FELA, the closely-related Jones Act, or, by comparison, state survivorship statutes.

Instead, where there is some evidence in support of a claim for conscious pain and suffering damages, a jury must ultimately decide whether the evidence proves that the decedent experienced "conscious pain and suffering" or whether any pain and suffering was instead "substantially contemporaneous" with death such that it can only be characterized as a mere incident of death or a "short period[] of insensibility which sometimes intervene[s] between fatal injuries and death." Craft, 237 U.S. at 655.  If a jury concludes, under this legal test, that the decedent's estate is entitled to pain and suffering damages, then it may consider all relevant factors, such as the circumstances of the accident and injuries, the length of consciousness, and the quality and extent of consciousness, in setting the appropriate amount thereof.  Dilger v. Consolidated Rail Corp., No. 97-7237, 1997 WL 829251, *1-2 (2d Cir. Oct. 31, 1997) (upholding conscious pain and suffering damages of $675,000 for approximately twenty minutes of consciousness) (collecting cases); Cook v. Ross Island Sand and Gravel Co., 626 F.2d 746, 750-52 (9th Cir. 1980)  (under Jones Act, evidence of consciousness for up to two and one-half

minutes before drowning supported award of conscious pain and suffering damages; reducing amount of jury verdict from $100,000 to $35,000 because it was excessive); S. Pac. Co. v. Heavingham, 236 F.2d 406, 409-10 (9th Cir. 1956) (questioning viability of dicta in Craft); In the Matter of Moran Towing Corp., No. 10-4844, --- F.Supp.2d ---, 2013 WL 6068454, at *29-31 (S.D.N.Y. Nov. 18, 2013) (under Jones Act, consciousness for at least two minutes sufficient to support an award of conscious pain and suffering damages of $750,000) (collecting cases); Dilger v. Consol. Rail Corp., No. 95-9674, 1997 WL 45526, *3 (S.D.N.Y. Feb. 4, 1997) (collecting cases); Mecca v. Lukasik, 530 A.3d 1334, 1344-45 (Pa. Super. Ct. 1987) (under Pennsylvania survivorship law, jury properly instructed that it could award conscious pain and suffering damages where there was no evidence that crash victims were rendered immediately unconscious in car accident); Teamann v. Zafris, 811 A.2d 52, 64-66 (Pa. Commw. Ct. 2002), abrogated on other grounds by McCreesh v. City of Phila., 585 Pa. 211 (2005) (under Pennsylvania survivorship law, award of pain and suffering damages based upon "several seconds" of consciousness allowed; amount of jury verdict reduced from $900,000 to $700,000 because "the shorter the duration of pain and suffering the smaller the award").

The record reflects that the Estate will present evidence that Monheim died from being buried by iron-ore pellets, but remained fully conscious for two minutes after the collision, and then progressed from consciousness to death during the next two minutes. (ECF Nos. 154 and 163 ¶¶ 31-32.) This evidence is adequate to warrant submitting the question of the availability and amount of conscious pain and suffering damages to a jury in this case.

### D. Son's Loss-of-Care Damages

The Railroad contends, in a footnote of its opening brief, that the Estate cannot recover damages meant to compensate Monheim's son for the deprivation of parental care, counseling, and training because it produced no evidence that those services were supplied by another for compensation since Monheim's death. (ECF No. 153 at 29 n.3.)  The Railroad states that it "does not need to discuss this claim any further" "[g]iven these clear admissions and omissions." (Id.)  In response, the Estate argues that those damages can be established through "testimony concerning the personal qualities of the deceased and the interest which he took in his family." (ECF No. 162 at 35.)  The Estate contends that Monheim's son is entitled to damages after he reaches the age of majority due to "special circumstances," specifically, his diagnosis of having Asperger's Syndrome and ADHD. (Id. at 34.)   In its reply brief, the Railroad restates its position and includes substantive argument, but cites only one additional decision in support of its position that if the Estate cannot produce receipts to prove out-of-pocket payments on behalf of Monheim's son, it cannot recover parental care damages. (ECF No. 158 at 28-31.)

The court concludes that the Estate produced sufficient evidence to warrant submission of the question of damages for Monheim's son's care, counseling, and training to the jury.  The jury, however, will not be permitted to assess any such damages after the child reaches the age of majority because the Estate failed to produce sufficient evidence of any special circumstances that would justify such an award.

### 1.  Loss-of-Care Damages Before the Age of Majority

Under the FELA, minor children are entitled to be compensated for the economic value attendant to the loss of care, counsel, training, and education which the child might have reasonably received from the parent. 45 U.S.C. § 51; In re Moran, 2013 WL 6068454, at *33-34;

<u>Davis v. CSX Transp., Inc.</u>, No. 10-74, 2012 WL 71362, at *2 (N.D.W.V. Jan. 10, 2012)(citing cases).  An award of loss-of-care damages is contingent on the production of evidence showing that "the deceased parent was fit to furnish such training, and that training and guidance had actually been rendered." <u>Solomon v. Warren</u>, 540 F.2d 777, 788 (5th Cir. 1976) (decided under analogous Death on the High Seas Act, 46 U.S.C. §§ 30301-30308); ECF No. 158 at 31 n.24 (citing California Civil Pattern Jury Instructions).  An award of loss-of-care damages does not extend to compensation for grief resulting from the loss of the warm and loving parental relationship.  The damages are a more limited and measurable award for loss of valuable services in the nature of instruction, training, and guidance. <u>See</u> <u>Red Star Towing & Transp. Co. v. The "Ming Giant"</u>, 552 F.Supp. 367, 377 (S.D.N.Y. 1982).

      The Railroad's contention that loss-of-care damages are only available to reimburse the Estate for expenditures actually made to replace Monheim's care, counseling, or training of the child lacks merit.  The Railroad argues that this rule is established by the Supreme Court's decision in <u>Michigan Central Railroad Company Vreeland</u>, 227 U.S. 59, 71 (1913), and cites to one other decision to support its argument, <u>Ard v. Metro-North Railroad Company</u>, 492 F.Supp.2d 95 (D. Conn. 2007).  These decisions fail to support the Railroad's assertion.  In <u>Vreeland</u> the Court found that a trial court's instruction to a jury that it could award damages to a decedent's widow for loss of care and advice, by drawing upon their "experiences as men," was improper.  <u>Vreeland</u>, 227 U.S. at 72-73.  In doing so, the Court contrasted the damages available to a spouse under the FELA, to the damages available to a child under the FELA, explaining that while a child may be entitled to damages for the loss of "care and advice," a spouse is not. <u>Id.</u> at 72-74.  The only damages issue appealed in <u>Vreeland</u> was whether the jury had been properly instructed with respect to what damages a widow was entitled to receive under the FELA.  Under

the circumstances, Vreeland did not hold, and could not hold, as the Railroad contends, that loss-of-care damages can only be awarded for a child if evidence of actual expenditures introduced at trial.

The Railroad cites only one other decision in support of its assertion the Estate must demonstrate that it made actual expenditures in order to be awarded loss-of-care damages. The Railroad is correct that in Ard the district court in Connecticut overturned a jury award of damages to a decedent's minor children because there was no "objective criteria from which the jury could arrive at a sum for loss-of-care damages." Ard, 492 F.Supp.2d at 102-03. In doing so, the district court specifically rejected the notion that the jury could have assessed those damages based upon its own common sense and knowledge. Id. at 103. The district court supported its holding by citing Vreeland for the proposition that "it was error to instruct a jury that it might estimate damages for loss of care 'from their own experiences as men.'" Id. As discussed above, however, the Supreme Court objected to that jury instruction because it allowed an award of damages for loss of "care and advice" to a widow, which is not a category of damages permitted by the FELA. Vreeland did not consider what kind of evidence is required to establish loss-of-care damages for a minor child, making Ard's citation of it for that purpose suspect.

In four pages of briefing, the Railroad cites to no other decisions in support of its asserted legal rule that actual receipts must be produced in order to recover loss-of-care damages for a decedent's child under the FELA. The court's review of the pertinent case law located no such requirement. The body of case law, instead, indicates that a pecuniary estimate can be made with respect to the amount of the child's loss, provided evidence about the decedent's relationship with the child is available. In re Moran, 2013 WL 6068454, at *33-34 (damages awarded based upon testimony with respect to the extent of the relationship between the

decedent and his child and collecting cases in which a "pecuniary estimate" was made of loss-of-care damages based upon testimonial evidence about parental relationship); Brown v. United States, 615 F.Supp 391, 400 (D. Mass. 1985) (court estimated the economic value of father's training and guidance); Edwards v. United States, 552 F.Supp. 635, 640-41 (D.C. Ala. 1982) (although expert testimony was available with respect to the value of lost household services, the court assigned a value attributable to loss of care, counsel, training, and education for the three children). In this case, there is testimonial evidence from the child's mother detailing the parental relationship between Monheim and the child, and the effect that Monheim's death had on the child in terms of receiving his father's care, counseling, and training. (ECF No. 155-6 at 53-55.) This evidence is sufficient to warrant submitting this damages claim to the jury.

### 2. Loss-of-Care Damages After the Age of Majority

An adult child may recover pecuniary damages for periods of time after he or she reaches the age of majority if there is evidence sufficient to prove special circumstances, such as a child's poor health, permanent physical infirmity, or limited mental abilities. See Kornblum v. CSX Transp., Inc., No. 03-57, 2005 WL 1241863, at *2-3 (S.D. Ind. May 24, 2005) (citing Louisville & Nashville R.R. Co. v. Wingo's Administratrix, 281 S.W. 170, 173 (Ky. 1926) and Boller v. Pa. R.R. Co., 185 F.Supp. 505, 508 (N.D. Ind. 1960)). However, "[i]n the absence of evidence that an adult child is either dependent upon or had any reasonable grounds for expecting any pecuniary benefit from a continuance of the decedent's life, a recovery on behalf of such child is excluded." Kozar v. Chesapeake & Ohio Ry. Co., 449 F.2d 1238, 1243 (6th Cir. 1971).

The record before the court would not support a reasonable jury finding that Monheim's son could be entitled to any damages after he reaches the age of majority due to special circumstances.[2]  The Estate produced no evidence to support its bald assertion to the contrary.  The record is devoid of testimony or documentation from school officials, treating medical professionals, social workers, experts, or the like about the child's conditions or limitations.  The only relevant evidence of record is Monheim's widow's testimony that her son, who is now in high school, was diagnosed with ADHD at the age of three, and Asperger's Syndrome at the age of four. (ECF No. 155-6 at depo. trans. p. 49.)

Monheim's widow's testimony reveals that the child no longer requires a special needs program at school, has an above average IQ, gets good grades, and has made progress in terms of normalizing social interactions and personal relationships. (Id. at p. 51-52.)   Monheim's widow testified that Monheim and she made no specific arrangements for the child's future care prior to Monheim's death, and that the child would probably live independently, with only a single concern expressed with respect to her son's ability to control impulse purchases. (Id. at 57, 58.)

---

[2] Notably, in its second amended complaint, the Estate seeks damages only for "the value of the care, counsel, training and education which decedent's minor child might reasonably have expected to receive from his father before reaching the age of majority." (ECF No. 98 ¶ 115(d) (emphasis added).)

No reasonable jury could find, based upon this evidence, that special circumstances exist. That question will not be submitted to the jury. To the extent a jury finds that any loss-of-care damages are appropriate, those damages will end when the child reaches the age of majority.[3]

IV.   **CONCLUSION**

For the foregoing reasons, the Railroad's motion for summary judgment is granted, in part, and denied, in part. An appropriate order will be filed contemporaneously with this opinion.

Date: January 24, 2014                                        BY THE COURT:

                                                              /s/ *Joy Flowers Conti*
                                                              Joy Flowers Conti
                                                              Chief United States District Judge

---

[3] The parties agree that funeral expenses are not to be included in a damages award under the FELA, and those expenditures will not be submitted to the jury for consideration.